IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 20–cv–01703–MDB

KEYADA KNOEN-HICKERSON,

  Plaintiff,

v.

FERRELLGAS, LP,

  Defendant.

---

## ORDER

---

  This matter is before the Court on Defendant Ferrellgas, LP's Motion for Summary Judgment. (["Motion"], Doc. No. 64.) Plaintiff Keyada Knoen-Hickerson filed a response (["Response"], Doc. No. 72) to the Motion to which Defendant has replied. (["Reply"], Doc. No. 83.) After reviewing the Motion, the related briefing, and the relevant case law, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment.

### SUMMARY FOR *PRO SE* PLAINTIFF

  The Court is dismissing the claims brought in connection with your termination. This is because your Complaint was never successfully amended to reflect the required exhaustion of administrative remedies. The Court is also dismissing all other claims, with the exception of your race-based hostile work environment claim. Other than the hostile work environment claim, your claims are either untimely, or they do not find enough support in the record to survive Defendant's summary judgment challenge.

You may amend your Complaint in a way that is consistent with the Court's decisions as set forth in this Order. However, if you choose to amend your Complaint you must do so on or before May 1, 2023. If you do not amend your Complaint, your case will still move forward on the remaining hostile work environment claim. This is only a high-level summary of the Court's decision. The Court's entire decision is set forth below and you should read it carefully.

## STATEMENT OF THE CASE

*Pro se* Plaintiff was employed by Defendant as a Customer Service Specialist ["CSS"] from October 2016 until April 2020. (Doc. No. 64, Ex. C, Ex. A ¶ 37.) Plaintiff contends that during her employment, she was discriminated against and subject to a hostile work environment based on her race, and that she was discriminated against based on her disability. (Doc. No. 10 at 3, 6–7.) Plaintiff further contends she was retaliated against for engaging the EEOC with a discrimination complaint and that Defendant violated the Family Medical Leave Act ["FMLA"]. (*Id.*) Defendant moves for summary judgment on each of Plaintiff's claims. (Doc. No. 64.)

## I.     Material Facts[1]

---

[1] As emphasized by Defendant in its Reply, to the extent Plaintiff disagrees with factual assertions made in the Motion, her Response does not cite evidence from the record to support her positions. Plaintiff attaches dozens of emails she says "reflect the pieces of the puzzle" to the Response but does not cite to those emails nor does she make any specific reference to any particular email. She also does not refer to the exhibits submitted by Defendant. At the summary judgment stage, a plaintiff's failure to refer to specific evidence significantly undercuts the assertions made in her response. *See Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) ("[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record."); *Stuart v. Erickson Living Mgmt.*, 2019 U.S. Dist. LEXIS 181733, *5, 2019 WL 7289016 (D. Colo. July 29, 2019) (stating that "the [plaintiff] must point to specific facts in an affidavit, deposition, answers to interrogatories, admissions, or other similar admissible evidence" to overcome summary judgment). Though Plaintiff proceeds *pro se*, the Court cannot "take on the responsibility of serving as [Plaintiff's] attorney in constructing arguments and searching the record." *Walcott v. United States*, 782 Fed. Appx. 728, 730 (10th Cir. 2019). Still, to the extent Plaintiff's contradictory factual assertions are readily identifiable from the portions of her deposition transcript, or other evidence provided by Defendant, the Court will note it.

**A.  Background**

Defendant operates in the energy industry, selling propane to residential, agricultural,

commercial, and industrial customers. (*Id.* Ex. A ¶ 2.) Defendant's corporate offices are located

in Liberty, Missouri. (*Id.* Ex. A ¶ 3.) Prior to restructuring its operations in 2020, Defendant

conducted its customer service operations under a "regional … business model." (*Id.* Ex. A ¶ 7.)

Under this model, Defendant's customer service operations "were broken up into regions, which

were further broken down into Service Centers, and even further separated into Service Units."

(*Id.*) Under this model, Defendant's "Southwest Region" was broken into ten Service Centers.

(*Id.*) One of these Service Centers was known as "the Denver, Colorado Service Center." (*Id.*)

The Denver, Colorado Service Center was broken into twelve Service Units. (*Id.*) As is relevant

here, one of these Service Units was the "Colorado Springs Service Unit." (*Id.*) Further relevant

to Plaintiff's allegations, Service Units were also located in Denver[2] and Fairplay, Colorado. (*Id.*

Ex. A ¶ 5.)

During the relevant dates, two CSSs were stationed at the Colorado Springs Service Unit,

one CSS was stationed at the Fairplay Service Unit, and two to three CSSs were in the Denver

Service Unit.[3] (*Id.* Ex. G ¶ 2.) Defendant

> relies on its [CSSs] to handle all things customer service, including inbound and
> outbound phone calls; working with customer[s] daily to sustain and improve
> business relationships; using fact-finding sales methods to customize Ferrellgas
> programs and service to meet the customer needs and strives to obtain new
> business; ensuring accurate account setup, maintenance, and the closing of all
> customer account information in Ferrellgas account systems; providing first call

---

[2] Though Plaintiff refers to this Service Unit as the "Denver" Service Unit, Ferrellgas, Inc. called
this Service Unit the "Henderson location." (Doc. No. 64 at 5 n 2.) In its briefing, and for
consistency, Defendant refers to this Service Unit as the Denver location. To avoid confusion,
the Court will do the same.

[3] The parties appear to be operating under the unstated agreement that, during the relevant
period, these CSSs were all white women, with the exception of Plaintiff.

> resolution for all customer inquiries; handling all customer complaints or issues by following Ferrellgas' customer complaint resolution policy; collecting customer payment and handling accounts payable; and all other tasks as assigned.

(*Id.* ¶ 7; *see* Ex. H; Ex. A ¶ 10.) "CSSs were also required to process walk-in customer sales if the [Service Unit] location had a dock operation that allowed for on-site sales." (*Id.* Ex. G ¶ 8; Ex. A ¶ 11.) The Colorado Springs Service Unit hired a Material Handler in November 2019 to "allow for this dock operation and walk-in, on-site propane sales." (*Id.* Ex. G ¶ 9; Ex. A ¶ 11.) The Material Handler resigned in February 2020, and no replacement was hired. (*Id.*)

On October 18, 2016, Plaintiff applied for a CSS position at the Colorado Springs Service Unit. (*Id.* Ex. B.) Plaintiff's application indicated she had worked in customer service for Xerox from 2012 to 2014. (*Id.* Ex. B at 2.) Plaintiff indicated she was open to a full or part-time position. (*Id.* Ex. B at 1.) Plaintiff was hired to a part-time CSS position on the same date as her application, and was given a start date of October 26, 2016. (*Id.* Ex. C.) The offer letter signed by Plaintiff stated, "the hours and/or days you are scheduled to work will vary according to business need." (*Id.*) Plaintiff testified that at the time of the offer, she was "told in the winter months where it's more business I would be doing eight hours [five days per week]." (*Id.* Ex. D at 23:3–25.) Plaintiff further testified that at the time of her hiring, she would have accepted a full-time position had it been offered. (*Id.* Ex. D. at 52:23–53:1.) Shortly after starting her employment, Plaintiff signed a Disability/Veterans Voluntary Self Identification Form and indicated she was not disabled. (*Id.* Ex. E.) Plaintiff also signed an "Essential Functions" form, indicating that she did not require reasonable accommodations to perform her position. (*Id.* Ex. F.)

Throughout her employment as a CSS, Plaintiff's direct superior was Debra Wade, a white woman and the "Customer Service Manager for the Denver Service Center." (*Id.* Ex. G ¶ 3.) In this role, Ms. Wade oversaw "the entire CSS team" under the Denver Service Center

umbrella. (*Id.* Ex. G ¶ 2.) Ms. Wade worked out of the Colorado Springs Service Unit with

Plaintiff. (*Id.* Ex. G ¶ 5.) Ms. Wade's direct superior was Andrew Tucker, the General Manager

of the Denver Service Center. (*Id.* Ex. G. ¶ 3.) Mr. Tucker was Plaintiff's "second line" manager

and managed Defendants' 12 Colorado Service Units. (*Id.* Ex. G ¶ 3–4.) Mr. Tucker worked out

of the Denver Service Unit office. (*Id.* Ex. G ¶ 5.) A second CSS, Lana Monger, presumably a

white woman, *see supra* n. 3, also worked at the Colorado Springs Service Unit location. (*Id.* Ex.

G at 1.) Ms. Monger was hired three years before Plaintiff was hired. (*Id.*)

### B.  2016 Harassment Complaint Against Plaintiff

On December 14, 2016, Ms. Monger filed an internal complaint against Plaintiff with

Defendant's Senior Human Resources Generalist, Robert Haynes. (*Id.* Ex. A ¶ 12–13; *see* Ex. I.)

Ms. Monger alleged that earlier that day she was verbally attacked by Plaintiff who cornered Ms.

Monger in her cubicle and shook her finger at Ms. Monger. (*Id.* Ex. I at 2.) Ms. Monger reported

that she felt "physically trapped" and "threatened" by Plaintiff. (*Id.*) There were no witnesses to

the alleged events. (*Id.* Ex. A ¶ 17.)

The day after the confrontation, Plaintiff and Ms. Monger met with Ms. Wade to discuss

the allegations. (*Id.* Ex. A ¶ 15; Ex. G ¶ 12.) In the meeting, and in an email following the

meeting,

> Plaintiff (1) denied all of Ms. Monger's allegations; (2) stated Ms. Monger's
> husband "tr[ied] to intimidate" her on December 14, 2016 because Plaintiff
> observed him "get out of [his] car while [Plaintiff] was sitting in [her] car and go
> and pull on the office front door" before the office opened; (3) stated she
> "observe[d Ms. Monger] lacking in her duties … slacking all day being off the
> phones … [and Plaintiff] did what needed to be done;" and (4) stated she felt
> uncomfortable with Ms. Monger asking her to complete a task the day before.

(*Id.* Ex. G ¶ 13; *see* Ex. J at 1–2.) In her deposition, Plaintiff acknowledged that a confrontation

occurred, stating Ms. Wade was out of the office that day and that she was frustrated by "Ms.

Monger trying to assert herself as my boss to tell me what to do." (*Id.* Ex. D. at 69:16–71:6.) In her Response, Plaintiff contends that Ms. Monger was the aggressor in the interaction, but she does not cite any evidence for this assertion and the Court has not independently located such evidence. (Doc. No. 74 at 5–6.)

Eventually, due in part to the lack of witnesses, Ms. Monger and Plaintiff "stated they wanted to move forward" and end any investigation into the complaint. (Doc. No. 64, Ex. G ¶ 16; Ex. A ¶ 17; *see* Ex. J at 3.) No disciplinary action was taken by Defendant. (*Id.* Ex. G ¶ 17; Ex. A ¶ 18.)

Plaintiff contends that Ms. Monger's husband twice acted to intimidate her. First, and as recounted by Plaintiff to Ms. Wade, on December 13, 2016, Ms. Monger asked Plaintiff for a ride home after work, and Plaintiff declined. (*Id.* Ex. J at 1.) The following morning, while Plaintiff was in her car in the office parking lot, she observed Ms. Monger and her husband pull into the lot.[4] (*Id.*) Ms. Monger's husband exited the vehicle while Ms. Monger remained inside, walked to the office door, and attempted to open it, finding the door locked. (*Id.*) Plaintiff "felt as if he was trying to intimidate me," because Plaintiff had declined to give Ms. Monger a ride home the day prior. (*Id.*) Plaintiff told Ms. Wade that Plaintiff called her husband and "Chris in the Fairplay office" after the incident. (*Id.*) In response to Plaintiff's allegations about the parking lot incident, Ms. Monger sent Mr. Haynes a "[f]ollow [u]p" email in which she corroborated her husband's actions but stated that her husband did not know the door was locked and was merely trying to use the office bathroom, "as he has done often in the past." She had remained in the vehicle saying goodbye to her son for the day. (*Id.* Ex. J at 4.)

---

[4] In her deposition, Plaintiff testified that this event occurred during her "first week," which would have been in October 2016. (Doc. No. 64 Ex. D at 63:9–14.) However, the emails provided by Defendant demonstrate that this took place on December 14, 2016. (*Id.* Ex. J.)

Second, Plaintiff testified in her deposition that a "a year or so" after this parking lot incident, Ms. Monger's husband squeezed her hand "real hard" when he introduced himself to her.[5] (*Id.* Ex. D at 76:10–79:4.)

### C.  Plaintiff Becomes a "Full-Time" Employee in 2017

Though hired as a part-time employee, from October 2016 to October 2017, Plaintiff's hours were virtually full-time. (*Id.* Ex. D at 24:22–25:10, 54:5–7.) Under the Affordable Care Act, an employer is required to offer health insurance to any part-time employee who averages 30 or more hours per week for at least one year. (*Id.* Ex. G ¶ 18; Ex. A ¶ 19; Ex. K.) From October 2016 to October 2017, Plaintiff averaged more than 30 hours per week. (*Id.* Ex. D at 24:22–25:10; Ex. G ¶ 20; Ex. A ¶ 21; Ex. K.) In such cases, Defendant's standard procedure was to formally "move those employees into full time positions" and send them "benefits enrollment packets." (*Id.* Ex. K.)

On November 13, 2017, Ms. Wade informed Plaintiff she was now a full-time employee. (*Id.* Ex. G ¶ 21.) Plaintiff remained a full-time employee until her employment was terminated. (*See id.* Ex. G ¶ 22 ("During the period from October 2017 to September 2018 and October 2018 to September 2019, Plaintiff averaged more than 30 hours of work per week.").) Plaintiff enrolled in various benefits her new status offered. (*Id.* Ex. G ¶ 21; Ex. A ¶ 22.)

Defendant contends, "Plaintiff did not complain about her conversion to full-time status, nor did she complain about the number of hours she had been working." (*Id.* at 10 (citing Ex. G ¶ 21; Ex. A ¶ 22).) Defendant also contends Plaintiff never complained about her hours or

---

[5] Additionally, in her Response, Plaintiff contends that at various points, her "vehicle would come up with flat tires" after being parked in the office parking lot, insinuating this was done by Ms. Monger's husband. However, Plaintiff does not point to any evidence to support this assertion, and the Court has not independently located such evidence.

requested to reduce them after becoming officially full-time. (*Id.* (citing Ex. G ¶ 23; Ex. A ¶ 24).) Plaintiff appears to dispute this assertion. In her deposition, Plaintiff testified that Ms. Wade offered her "full time three times"—ostensibly prior to her being automatically switched to a full-time employee due to the number of hours she worked—and Plaintiff turned each offer down. (*Id.* Ex. D at 52:2–18.) In her Response, Plaintiff contends that she responded "no [to these offers] because of the hostile working environment." (Doc. No. 74 at 6.) Further, Plaintiff appears to state that she assumed she would eventually return to part-time hours but does not cite any evidence to support these claims. (*Id.* at 7.)

### D.  Plaintiff Files an Internal Complaint in October 2018

As part of her CSS duties, Plaintiff was occasionally required to work collaboratively with CSSs from different Service Units. (*See* Doc. No. 64 Ex. G ¶ 24–26.) During the relevant period, Plaintiff had two disputes with Heidi Bralish, a CSS working out of the Denver Service Unit. (*Id.* Ex. G ¶ 27–28; *see also* Doc. No. 74 ("[T]his incident between Heidi and I was just an ongoing thing[.]").)

First, on July 26, 2018, Plaintiff left a voicemail for a customer requesting payment on a propane order. (*Id.* Ex. G ¶ 27.) A short time later, the customer made a return call, answered by Ms. Bralish. (*Id.* Ex. M.) Ms. Bralish sent an instant message informing Plaintiff that the customer was on the line. (*Id.*) Plaintiff told Ms. Bralish to take the payment, but Ms. Bralish said the system showed the payment was already made. (*Id.*) Plaintiff simply responded, "do like I ask please." (*Id.*) Ms. Bralish forwarded the message chain to Ms. Wade, asking her to "call [Ms. Bralish] regarding this conversation." (*Id.*)

Later, on October 1, 2018, Ms. Bralish emailed Plaintiff "asking her to call a customer Plaintiff had previously worked with to set up propane deliveries." (*Id.* Ex. G ¶ 28; *see id.* Ex.

N.) Plaintiff, adding Ms. Wade to the email chain, responded that delivery had already been made to the customer. (*Id.* Ex. N at 2.) Ms. Bralish replied that the customer was complaining about a second, unordered delivery that had been made to him. (*Id.*) Ms. Wade directed Plaintiff to call the customer over Plaintiff's protestation that she "was not on the phone when he call[ed]." (*Id.* Ex. N at 1–2.) Later that day, Plaintiff sent Ms. Wade an email saying she "need[ed] the rest of the week off [Tuesday–Friday] ([s]ick) [s]tress related[.]" (*Id.* Ex. O.) Ms. Wade approved the request. (*Id.* Ex. G ¶ 29.) In her Response, Plaintiff asserts that though Ms. Wade approved the request, she did not do so "without voicing her disapproval to me wanting the time off." (Doc. No. 74 at 7.) However, Plaintiff does not point to any evidence to support this assertion, and the Court has not independently located such evidence.

The following day, October 2, 2018, Plaintiff sent a letter to Ms. Wade and Mr. Tucker making "a formal complaint of racial tension and … a hostile [working] environment." (Doc. No. 64 Ex. P at 1; Ex. D at 82:25–83:9.) Plaintiff alleged "several instances where I have been made to feel ostracize[d] from within the office here at [Ferrellgas] and not treated as an equal but made to be felt less than[.]" (*Id.* Ex. P at 1.) Plaintiff specifically referenced the actions of Ms. Monger's husband and occasions on which the appropriateness of her "work apparel" was questioned by Ms. Wade. (*Id.* Ex. P at 1–2.) Plaintiff also complained about the amount of work she was being assigned and contended that employee reviews were done on the basis of tenure rather than job performance. (*Id.* Ex. P at 2.) Additionally, Plaintiff stated that she had "met with [Ms. Wade]" and "expressed [her] grievance verbally," but no remedial action had been taken. (*Id.* Ex. P at 1.)

### E.  Dress Code Issues

In her deposition, Plaintiff testified that she commonly wore dark blue, "stretchy … slacks" in the office. (*Id.* Ex. D at 83:12–19.) These pants were "not denim" but did resemble jeans in color. (*Id.*) While Defendant's dress code does not appear to explicitly forbid wearing denim (*see id.* Ex. S), Plaintiff testified that jeans were not allowed. (*Id.* Ex. D at 83:21–86:1.) Plaintiff testified that Ms. Wade questioned her about these pants and said she "shouldn't wear those pants" due to the dress code "about five times." (*Id.* Ex. D at 85:7–23.) In her affidavit, Ms. Wade disputes Plaintiff's representation: "there was one instance in which I asked Plaintiff whether she was wearing jeans …. Plaintiff informed me they were not jeans but a dark blue dress pant material. I did not follow up … and she continued to wear them throughout her employment[.]" (*Id.* Ex. G ¶ 32.) Plaintiff was never disciplined nor asked to change on these occasions. (*Id.* Ex. D at 85:20–86:1.) Plaintiff further admitted she had violated the dress code by wearing "leggings once or twice," but Ms. Wade did not take issue. (*Id.* Ex. D at 87:1–6.)

Plaintiff also testified that Ms. Bralish commonly violated the dress code policy but was not subject to questioning or discipline. (*Id.* Ex. D at 88:1–12 (saying Ms. Bralish "came to work in flip-flops, … leggings, … pajamas, … [and] short clothes way above her knee").) Plaintiff contended that though she worked in the Colorado Springs office and Ms. Bralish primarily worked in the Denver office, she had seen pictures of Ms. Bralish's attire and assumed, based on Ms. Bralish's continued violations of the dress code, she was not being disciplined. (*Id.* Ex. D at 91:1–92:4.) Though Mr. Tucker worked from the Denver office and Ms. Wade worked from the Colorado Springs office, Plaintiff believed Ms. Wade, as Ms. Bralish's direct supervisor, should have disciplined Ms. Bralish for her dress code violations. (*Id.* Ex. D at 92:13–25.)

### F.  Plaintiff's Workload and Performance Evaluations

Ms. Wade suffered a health event in February 2018, causing her to be away from the office for a significant period of time following this event.[6] (*Id.* Ex. D at 37:1–6.) Plaintiff testified she was given "extra duties" during Ms. Wade's leave. (*Id.* Ex. D at 29:9–17.) These duties included maintaining the safe, petty cash, dealing with walk-in customers, getting the office mail, and performing minor administrative tasks around the office. Plaintiff stated these duties were split with Ms. Monger.[7] (*Id.*)

In her Response, Plaintiff repeatedly states that job evaluations were conducted based on tenure rather than performance. (Doc. No. 74 at 7, 9.) Plaintiff testified that "employee evaluations.… were done unjustly. [Ms. Wade] did evaluations based on tenure, so I was never getting the scores I should have been getting." (Doc. No. 64, Ex. D at 145:15–19.) Plaintiff also testified that though Ms. Wade repeatedly told her she performed well at her job, she also told her that she couldn't get higher evaluation scores "because [Plaintiff hadn't] been there that long." (*Id.* Ex. D at 145:23–147:5.) In her affidavit, Ms. Wade disputes this representation: "[a]t no point during Plaintiff's employment did I base her performance evaluation on her tenure— they were always based on her performance. I thought highly of Plaintiff's performance and gave her positive performance reviews." (*Id.* Ex. G ¶ 37.) The Court has not located any evidence— other than Plaintiff's testimony—that performance evaluations were based on tenure rather than performance.

---

[6] Plaintiff refers to this as a seizure. Defendant refers to this as a stroke. (Doc. No. 64 Ex. G ¶ 41.) The exact length of Ms. Wade's leave is unclear.

[7] In her Response, Plaintiff contends that while Ms. Wade was out of the office, Ms. Monger was "even more aggressive nasty towards me," and that "because of my new duties Lana Monger did everything she could to set me up to fail from placing an out to lunch sign on the door when she would leave to holding on to cash on my week until her week came around again so she could leave during work hours or have extra time added to her lunch to get a Money Order." (Doc. No. 74 at 8.) However, Plaintiff does not point to any evidence to support these assertions, and the Court has not independently located such evidence.

Plaintiff also testified that she received the "lowest salary" of any CSS. (*Id.* Ex. D at 142:17.) Plaintiff testified that during her employment, a new CSS was hired at Denver Service Unit and started with a higher wage than her. (*Id.* Ex. D at 142:18–24.) Plaintiff admitted that this new CSS had 25 years of experience but contended that though Plaintiff was only hired with two years of formal customer service experience, her time as a nurse and working for her parents' "tooling company" and "trucking company" gave her more than 25 years of informal experience in customer service. (*Id.* Ex. D 142:25–144:12.) Plaintiff also appeared to testify later that she was eventually given a raise to match the new CSS's hourly wage. (*Id.* Ex. D at 144:15–23 (testifying that the new CSS "said she was making [$]17.55. and that was more than me" and then stating that Plaintiff eventually began receiving $17.55 "because I finally had [received] a 10-cent raise after [the new CSS] was hired").) When asked whether any other CSS with less seniority made more than Plaintiff, she did not directly respond. (*Id.* Ex. D at 145:9–13.) Plaintiff also testified she earned the highest commission and bonus of the CSSs. (*Id.* Ex. D at 94:13–95:9, 120:15.)

### G.  Ostracization

In her deposition, Plaintiff testified that "all [of her fellow CSSs] treated [her] poorly," with the exception of a CSS in Denver named Mary Osborne. (*Id.* Ex. D at 61:20–24.) "They just talk to you any kind of way. They assert themselves towards me where they had no place to do so." (*Id.* Ex. D at 62:4–10.) Plaintiff also testified that she often cried at work due to her experiences, and identified Ms. Monger, Ms. Bralish, and Christina Evans (the CSS at the Fairplay office) as the primary sources of the alleged ostracization. (*Id.* Ex. D at 97:16.) Plaintiff described the CSSs, as "very petty," and told Ms. Wade that a male CSS should be hired. (*Id.* Ex. D at 98:19–25.)

More specifically, Plaintiff testified that Ms. Monger was mean, "territorial, envious, jealous," and "bossy." (*Id.* Ex. D at 43:13.) She also testified that Ms. Monger "didn't want me to touch her." (*Id.* Ex. D at 95:22–96:7.) Plaintiff testified about one occasion when Plaintiff was visiting with Ms. Monger and Ms. Evans (who was visiting the Colorado Springs Service Unit). (*Id.*) While discussing the smell of an envelope the office had received, Ms. Monger handed the envelope to Ms. Evans to smell, placing it in her hand. (*Id.*) After Ms. Evans returned it, Ms. Monger placed the envelope on the desk for Plaintiff to smell rather than handing it to her. (*Id.*) Plaintiff testified that Ms. Monger "could never put [anything] in my hand," and "treated me as if I was beneath her." (*Id.*; *id* Ex. D at 141:14–15.) Plaintiff testified that this incident occurred shortly after she was hired, in 2016 or early 2017. (*Id.* Ex. D at 94:12–96:21.) Plaintiff also testified she "expressed" to Ms. Wade that "how [Ms. Monger] was trying to make [her] feel," including that she believed things were "wiped down" after she used them. (*Id.* Ex. at 96:9–21.)

Plaintiff testified that she "was the only one being treated like [this]." (*Id.* Ex. D at 141:1.) She expressed frustration that "there was no training with the ladies in regards to … being educated in and trained in working with someone culturally different…. It was just hostile…. I did not feel safe." (*Id.* Ex. D at 141:6–25.) Plaintiff admitted, however, that she could not recall her race ever being mentioned. (*Id.* Ex. D at 142:1–4.)

\*\*\*

Ms. Wade forwarded Plaintiff's October 2, 2018, complaint to Mr. Haynes, the Senior Human Resource Generalist. (*Id.* Ex. G ¶ 31.) Ms. Wade informed Plaintiff that her complaint had been sent to Mr. Haynes. (*Id.* Ex. Q.) On October 4, 2023, Plaintiff emailed Mr. Haynes regarding her complaint, attaching a revised complaint that primarily served to fix typographical errors. (*Id.* Ex. R.) In her email, Plaintiff made clear it was not her intent to engage the human

resource department unless she failed to achieve any results with her complaint, but Ms. Wade had forced her hand by forwarding her complaint. (*Id.*)

### H.  Plaintiff Requests to Be Placed on Intermittent Leave

On October 5, 2018, three days after filing her internal complaint, Plaintiff sent a text message to Ms. Wade asking to be "place[d] … on a leave of absence starting on Tuesday[,] Oct[.] 2[,] and to include a[n] intermittent leave as well for further doctor[']s [appointments]." (*Id.* Ex. W.) On October 12, 2018, Plaintiff submitted a Family Medical Leave Act ["FMLA"] Certification of Health Care Provider form with Defendant. (*Id.* Ex. X.) The Certification stated that Plaintiff suffers from a history of bipolar disorder and required intermittent leave to attend weekly treatments for her bipolar disorder and to combat manic episodes. (*Id.* Ex. X ("Stress on the job causes extreme anxiety at times, triggering manic episodes. Requires visits for treatment and may requires absence during manic episodes.").) Defendant contends that this was the first time it learned that Plaintiff lives with bipolar disorder. (*Id.* Ex. D at 158:13–15.) Ms. Wade was not informed of Plaintiff's specific medical condition. (*Id.* Ex. G ¶ 38.)

Plaintiff testified that Defendant did not deny any of her requests for FMLA leave through the remainder of her employment. (*Id.* Ex. D. 174:8–11, 211:17–22; Ex. Y.) Plaintiff also testified that she occasionally skipped a work day when she woke up feeling "manic," "depressed," or "stressed" without alerting her coworkers or supervisors. (*Id.* at 130:12–133:24, 166:24–167:13.) Plaintiff apparently believed FMLA allowed her to be absent from work without notification. (*See id.* Ex. AA.) Ms. Wade and Mr. Haynes informed her that this was not the case, but Plaintiff testified that she continued to occasionally "no call, no show" and then "come in [the next day] and say … I'm going to use [FMLA leave for yesterday's absence]." (*Id.*

Ex. AA; Ex. D at 167:17–168:6.) Plaintiff never received a disciplinary action due to this use of FMLA leave. (*Id.* Ex. D at 171:9–11.)

However, in her Response and testimony, Plaintiff alleges that, though every leave request was granted, she felt "threatened of being fired" due to her FMLA requests. (*Id.* Ex. D at 167:14–16; *see* Doc. No. 74 at 10.) Plaintiff testified that Ms. Wade was "rude," "rough," "angry," and "[un]pleasant" about her leaves of absence. (Doc. No. 64 Ex. D at 132:15–133:2.) Plaintiff admitted, however, that Ms. Wade never explicitly stated she wanted to fire her for her use of FMLA leave. (*Id.* Ex. D at 136:6–10; *see also* Ex. G ¶ 39 ("I never … threatened to fire [Plaintiff] for taking her FMLA leave.").) Plaintiff also later testified that Ms. Wade's frustration stemmed not from Plaintiff's use of FMLA leave but from the weekdays Plaintiff commonly used leave. (*Id.* Ex. D at 209:1–2 (It's not so much [the] use [of] FMLA [leave], it was … what date … I was requesting.").) Plaintiff testified that Ms. Wade asked her to use Tuesdays and Wednesdays for her appointments, but Plaintiff's appointments were commonly Fridays. (*Id.* Ex. D at 209:1–14; Ex. Y.) Still, Plaintiff's Friday requests were never denied. (*Id.* Ex. D. 174:8–11, 211:17–22.)

## I.   Discussions Following Plaintiff's Internal Complaint

On October 10, 2018, Mr. Haynes and Plaintiff discussed Plaintiff's allegations. (*Id.* Ex. A ¶ 29.) In his affidavit, Mr. Haynes states that during that conversation, Plaintiff

> (1) stated she believed other CSSs delegated their work assignments to her; (2) stated there was one instance in which Ms. Wade commented on Plaintiff's pants, believing they were a tight-fitting denim material which would have violated the dress code policy; (3) reiterated her complaint regarding Ms. Monger's husband from 2016 which had already been resolved; and (4) could not provide any other examples of why she felt ostracized outside of her belief that other CSSs delegated their work to her and the one instance in which Ms. Wade commented on her attire.

(*Id.* Ex. A ¶ 29; *see id.* Ex. S.) Plaintiff does not appear to dispute this summary, though she testified that Ms. Monger's husband still occasionally spent time around the office. (*Id.* Ex. D at 76:14–79:25; *see* Doc. No. 74 at 8.) Plaintiff also testified that Mr. Haynes "mentioned to me … 'if things aren't going too good on the job, I don't know what your financial situation is for your household, but why don't you talk to your husband and see if you can quit." (Doc. No. 64, Ex. D 48:23–49:24; *see* Doc. No. 74 at 8 ("They would just try to get me to quit rather than hold those who needed to be held accounted for their actions regarding the harassment and racial tension towards me as a black female employee and ostracized in the workplace.").) Mr. Haynes disputes this allegation: "[a]t no point during this investigation, or any other time during Plaintiff's employment did I ever tell Plaintiff she should 'quit her job.'" (Doc. No. 64 Ex. A ¶ 33.) Mr. Haynes further states, "the investigation into Plaintiff's complaints did not substantiate her allegations of discrimination, harassment, unfair treatment, or other CSSs delegating their work assignments to her[.]" (*Id.* Ex. A ¶ 30.) However, Mr. Haynes advised Ms. Wade to send an email to all CSSs reiterating Defendant's dress code, anti-harassment policy, work distribution requirements, and a reminder that the "essential function" of the CSSs was to resolve customer inquiries. (*Id.*) Ms. Wade subsequently sent these reminders to the CSSs. (*Id.* Ex. L; Ex. T.)

In the days following their meeting, Plaintiff told Mr. Haynes via email that it felt "uncomfortable," and like she was a "target" after making her complaint. (*Id.* Ex. U at 2, 3.) On October 30, 2018, Ms. Wade held a follow-up meeting with Plaintiff. In an October 31, 2018, email Ms. Wade described the meeting to Mr. Haynes: "[t]he meeting went fine. [Plaintiff] did not bring up any [issues of] retaliation, hostile work environment or racial tension. She said she felt I was dismissing her complaints and the workload isn't even." (*Id.* Ex. U at 6.) Plaintiff's complaint was closed on October 31, 2018. (*Id.* Ex. A ¶ 32.)

**J.  Plaintiff Files First Equal Opportunity Employment Commission Charge in October 2019**

On October 21, 2019, Plaintiff filed a Charge of Discrimination ["Charge One"] with the Equal Employment Opportunity Commission ["EEOC"]. (*Id.* Ex. CC.) On the form, Plaintiff marked that she had been discriminated against on the basis of race and disability, and she had been retaliated against for her internal complaint. (*Id.*) Plaintiff alleged that "similarly situated [CSSs] have, and continue to delegate their work or their undesirable assignments to me[,] … similarly situated [CSSs] are allowed … [to violate the] dress code[,] … my hours [were changed] to full-time without my consent[,] … our human resources representative … suggested I seek other employment[, and] my employer has attempted to restrict me from using [FMLA leave] at the times I have chosen." (*Id.*) Plaintiff also alleged that she had been "retaliated against for opposing discrimination in the workplace."[8] (*Id.*)

On March 12, 2020, the EECO dismissed Charge One, finding that it was "unable to conclude that the information obtained establishes a violation of the statutes." (*Id.*) Plaintiff was given notice of her right to file suit regarding her allegations. (*Id.*)

**K.  Plaintiff's Employment is Terminated in April 2020**

"Due to Ferrellgas' financial condition, including an upcoming debt maturity of $357 million, which Ferrellgas was ultimately unable to satisfy, an organizational consultant was hired to look for opportunities to improve the efficiency of the Company's business operations." (*Id.* Ex. A at ¶ 37; Ex. GG ¶ 5.) Among other things, the consultant recommended that Defendant switch to a "centralized customer service model" to cut the company's expenses. (*Id.*) Accordingly, "an executive decision was made to restructure Ferrellgas' Customer Service organization into a single Customer Service Center which eliminated the prior Regional –

---

[8] The operative Complaint does not repeat this last allegation. (Doc. No. 10.)

Service Center – Service Unit CSS breakdown and eliminated 95 CSS positions" across the company. (*Id.*) In line with this decision, Mr. Tucker was instructed to reduce the Denver Service Center's CSS staff. (*Id.* Ex. A ¶ 37.) Mr. Tucker decided to eliminate Plaintiff's position.[9] (*Id.*) Plaintiff was informed of her termination in April 2020. (*Id.*; *see* Doc. No. 74 at 10–11.)

Plaintiff testified to her belief that she was terminated for filing Charge One with the EEOC. (Doc. No. 64 Ex. D at 220:16–19.) Plaintiff stated it was "suspect" that she was terminated just a few weeks after receiving the right-to-sue letter on Charge One, but also stated she was never told the EEOC action was a basis for her termination. (*Id.* Ex. D at 220:20–221:12.) Plaintiff testified she was told it was her, and not Ms. Monger, being terminated because Ms. Monger had been hired three years before Plaintiff. (*Id.* Ex. D at 215.)

Defendant contends it was unfeasible and unnecessary to continue with two CSSs in Colorado Springs due to the low volume of work at that location compared to other locations. Defendant points to Plaintiff's testimony that the Colorado Springs location was a "light load" that one person could handle and did not "have traffic like [the] Denver [office]." (*Id.* Ex. D at 50:11–18, 51:10–15, 113.7–10.)

Five of the 95 CSS positions eliminated across the company identified themselves as disabled.[10] (*Id.* Ex. A ¶ 38; Ex. GG ¶ 6.) Further, "these individuals identified their races as follows:"

- American Indian – 1
- Asian – 1
- Black – 3

---

[9] Defendant provides no indication that any other Denver Service Center CSS was terminated. Defendant also does not identify how many Southwest Region CSSs were terminated.

[10] Defendant states that this does not include Plaintiff, as she did not identify herself as disabled at the time of hiring and never amended this identification. (*See* Doc. No. 64 Ex. E; Ex. F.)

- Hispanic – 5
- Hispanic/White – 4
- White – 80
- Not Specified – 1

(*Id.*)[11]

### L.  Plaintiff Files this Case

Plaintiff commenced this action on June 10, 2020, bringing claims for hostile work environment and discrimination on the basis of race under Title VII, and disability under the Americans with Disabilities Act ["ADA"]. (Doc. No. 1); *see* 42 U.S.C. § 2000e-1, *et seq*.; 42 U.S.C. § 12101 *et seq*. Plaintiff further alleges that Defendant violated the FMLA and retaliated against her for her EEOC activity by terminating her employment. (Doc. No. 1.) Plaintiff amended her Complaint on June 15, 2020, and again on July 13, 2020, adding factual allegations. (Doc. Nos. 7; 10.)

### M. Plaintiff Files Second Equal Opportunity Employment Commission Charge in January 2021

When Plaintiff filed the instant case, she had not exhausted her avenues for administrative relief regarding her termination. On January 11, 2021, Plaintiff filed a second charge ["Charge Two"] with the EEOC regarding her termination. (Doc. No. 64 Ex. DD.) The EEOC eventually dismissed Charge Two, and Plaintiff was notified of her right to sue on August 18, 2021. (*Id.*) On September 16, 2021, Plaintiff moved to amend her Complaint, requesting to "[a]dd the … charge 'Retaliation & Wrongful Termination' to the current case." (Doc. No. 39.) However, the Honorable Kathleen Tafoya denied the motion for failure to comply with D.C.COLO.LCivR 7.1(a) and 15, and for attempting to incorporate her operative Complaint by

---

[11] In her Response, Plaintiff contends that Defendant "did call some[ of] those fired to come back to work." (Doc. No. 74 at 11.) However, Plaintiff does not point to any evidence to support this assertion, and the Court has not independently located such evidence.

reference. (Doc. No. 40.) Plaintiff again attempted to amend the operative Complaint on October 22, 2021, and on November 15, 2021, attaching the Charge Two right-to-sue letter. (Doc. Nos. 41; 43.) Judge Tafoya denied these motions on the same basis as Plaintiff's original attempt. (Doc. Nos. 42; 45.) Plaintiff has not made a subsequent attempt to amend her Complaint.

## LEGAL STANDARDS

### I.   Fed. R. Civ. P. 56

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law." *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (quoting *Anderson*, 477 U.S. at 251-52). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## II.    *Pro Se* Plaintiff

Plaintiff is proceeding *pro se*. The Court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *accord Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). This rule applies to all proceedings involving a *pro se* litigant, including summary judgment proceedings. *Hall v. Bellmon,* 935 F.2d 1106, 1110 n.3 (10th Cir. 1991); *see Overton v. United States*, 925 F.2d 1282 (10th Cir. 1990) (liberally construing *pro se* pleadings in a summary judgment review). However, Plaintiff's *pro se* status does not vitiate his obligation to adhere to, and comply with, "the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (quoting *Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992)); *Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994) (stating that a *pro se* litigant must "comply with the fundamental requirements of the Federal Rules of Civil and Appellate Procedure"). Nor does Plaintiff's *pro se* status entitle her to an application of different rules. *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002). Thus, while the Court makes "some allowances" for Mr. Hoffman's "failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence

structure, or his unfamiliarity with the pleading requirements," the Court will not "take on the responsibility of serving as [his] attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Hall*, 935 F.2d at 1110) (alteration omitted).

## ANALYSIS

### I.     Plaintiff's "Charge Two" Claims and Administrative Exhaustion

Defendant first argues it is entitled to summary judgment on the claims stemming from Plaintiff's termination because the EEOC had not issued Plaintiff a Charge Two right-to-sue letter at the time the operative Complaint was filed. (*See* Doc. Nos. 10; 36.)

Before filing suit under Title VII or the ADA, a plaintiff must exhaust her administrative remedies with the EEOC. "To exhaust administrative remedies, an individual claimant must: (i) timely file a charge of discrimination with the ["EEOC"] setting forth the facts and nature of the charge; and (ii) receive notice of the right to sue." *Christie v. Loomis Armored US, Inc.*, No. 10-CV-02011-WJM-KMT, 2013 WL 3381268, at *3 (D. Colo. July 8, 2013).

After the Tenth Circuit's decision in *Lincoln v. BNSF Railway Company*, however, the exhaustion of administrative remedies is no longer a jurisdictional pre-requisite to a Title VII or ADA action in the Tenth Circuit. 900 F.3d 1166, 1185 n.10 (10th Cir. 2018). Thus, "a plaintiff's failure to file an EEOC charge regarding a discrete employment incident ... does not bar a federal court from assuming jurisdiction over a claim." *Id.* at 1183–85. The failure is, however, an affirmative defense to the impacted claims. *See Lincoln*, 900 F.3d at 1185 ("[T]he full court now holds that a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim."); *Payan v. United Parcel Serv.*, 905

F.3d 1162, 1169 (10th Cir. 2018). Significantly, the "distinction between a jurisdictional requirement and an affirmative defense is immaterial" in a case where the defendant has "'properly presented' [the issue] for decision." *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018) (quoting *McQueen ex rel. McQueen v. Colo. Springs Sch. Dist. No. 11*, 488 F.3d 868, 873 (10th Cir. 2007)).

Here, Defendant's answer to the operative Complaint raises a failure to exhaust affirmative defense. (Doc. No. 19 at 14 ("Plaintiff's claims are barred to the extent she failed to exhaust her administrative remedies.").) Defendant also re-raises the defense in the Motion. (Doc. No. 64 at 21 ("[A] plaintiff may not bring a Title VII or ADA action based on claims that were not submitted to the EEOC as part of a timely filed EEOC charge of discrimination for which the plaintiff has received a right-to-sue letter.").)

At the time the operative Complaint was filed, Plaintiff had already been terminated but had not filed an EEOC charge, much less received a right-to-sue letter concerning her termination. In other words, while the operative Complaint purports to bring claims concerning the termination of Plaintiff's employment, at its filing, Plaintiff had not exhausted her administrative remedies on such claims. After engaging the EEOC and eventually receiving a right-to-sue letter on Charge Two, Plaintiff made multiple attempts but failed to amend her Complaint to reflect exhaustion of her administrative remedies. (*See* Doc. Nos. 39; 41; 43.) Accordingly, the Court agrees that Defendant is entitled to summary judgment on any claim related to Plaintiff's termination.

However, the Court must consider whether Plaintiff's Charge Two claims should be dismissed with or without prejudice. Defendant suggests these claims should be dismissed with prejudice because Plaintiff had "ninety days from receipt of the EEOC's right-to-sue letter in

which to file an action … in district court," and ninety days have passed since Plaintiff received a right-to-sue letter on Charge Two. (Doc. No. 64 at 22–23); *Goldsby v. James*, 580 F. App'x 685, 687 (10th Cir. 2014). The Court disagrees. Plaintiff's first attempt to amend her Complaint following the Charge Two right-to-sue letter came on September 16, 2021—just 29 days after Plaintiff received the right-to-sue letter on August 18, 2021. (Doc. Nos. 39; 36.) If Plaintiff sought to amend the operative Complaint now, it would be appropriate to apply equitable tolling or have the amendment relate back to the prior attempts. *See Million v. Frank*, 47 F.3d 385, 389 (10th Cir.1995) (saying that the ninety-day filing requirement "is a condition precedent to suit that functions like a statute of limitations and is subject to waiver, estoppel and equitable tolling" and saying that "the Supreme Court has allowed equitable tolling in situations where the claimant has actively pursued judicial remedies by filing a defective pleading during the statutory period") (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990)); *Stransky v. HealthONE of Denver, Inc.*, 868 F. Supp. 2d 1178, 1182 (D. Colo. 2012) (granting a request to equitably toll a statute of limitations when the "interests of justice [were] best served" by the tolling). To the extent Defendant believes the amendment should be denied on futility or other grounds, Defendant can make that argument in response to any motion to amend Plaintiff chooses to file.

## II.     Plaintiff's "Charge One" Claims

### A.  Disparate Treatment

Plaintiff alleges the following acts of race and/or disability discrimination in connection with Charge One: (1) the unfair delegation of assignments by other CSSs causing a heavy workload; (2) verbal reprimands for her work attire; (3) having her employment status changed from part-time to full-time without her consent; (4) being told to seek other employment by a

human resources officer; (5) unfair performance evaluation(s) based on tenure rather than performance; and (6) being threatened by Ms. Monger's husband. (Doc. Nos. 10; 64 Ex. CC.) The Court also construes a claim for pay discrimination.[12] (*See* Doc. No. 10-1 at 1.)

Defendant argues that it is entitled to summary judgment on Plaintiff's Charge One disparate treatment claims because the allegations in Charge One describe events that occurred outside the 300-day statute of limitations for an EEOC charge. (Doc. No. 64 at 21–23.) In the alternative, Defendant argues that the evidence fails to establish a *prima facie* case for race or disability discrimination.

### 1. Some, but not all, of the alleged discriminatory acts are time-barred.

"In Colorado, for a charge of discrimination to be timely, it must be filed with the appropriate agency within 300 days of the complained-of conduct." *Christie*, 2013 WL 3381268, at *3 (citing *Proctor v. United Parcel Serv.,* 502 F.3d 1200, 1206 (10th Cir. 2007)). "Generally, each discrete act of discrimination starts its own 300 day limitation period for filing a charge as to that act." *Id.* (citing *Haynes v. Level 3 Comm'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006) *abrogation on other grounds recognized by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012)). "However, in cases involving a hostile work environment, the Court can consider acts that occurred outside of the 300 day limitations window because such claims 'cannot be said to occur on any particular day, and instead usually involve a pattern of acts that aren't actionable on their own but give rise to legal violation only when addressed in their totality.'" *Id.* (quoting *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1178 (10th Cir.2011) (internal quotations omitted)).

---

[12] Plaintiff's pay discrimination claim is not time-barred and the Court will address it in the merits analysis. *See infra* at 33–35; *Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1010 (10th Cir. 2002) (stating that "each race-based discriminatory salary payment constitutes a fresh violation of Title VII" for the purpose of an EEOC statute of limitations analysis).

Plaintiff filed Charge One on October 21, 2019. (Doc. No. 64 Ex. CC.) Accordingly, each of the alleged acts of discrimination on which Plaintiff's claims are based, must have occurred on or before December 25, 2018—300 days prior to the filing of Charge One.

As to: (1) the change of Plaintiff's employment status from part-time to full-time, (2) Mr. Haynes' alleged comment that Plaintiff should consider quitting her job, and (3) Ms. Monger's actions in the office parking lot, each of these events or actions occurred on readily identifiable dates: November 12, 2017, October 10, 2018, and December 14, 2016, respectively. (Doc. No. 64, Ex. K; Ex. A ¶ 29; Ex. D 48:23–49:24, Ex. J.) There is no question therefore, that these events occurred prior to December 25, 2018, and outside the 300-day window applicable to EEOC charges. Accordingly, insofar as these allegations constitute discrete adverse employment actions, they are time-barred.[13]

The three remaining alleged adverse employment actions—(1) the unfair delegation of assignments causing a heavy workload; (2) the verbal reprimands for her work attire; and (3) the unfair performance evaluation(s)—are more challenging to pin down to a specific date. The allegedly unfair delegation of assignments took place over an extended period of time, and the others, though discrete events, took place on undefined dates.[14] *See Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002), *as amended on denial of reh'g* (Jan. 23,

---

[13] The Court notes, however, that though these discrete events are time-barred as part of a disparate treatment analysis, the allegations are still relevant to, and can be considered as part of, Plaintiff's hostile work environment claim.

[14] Defendant contends that, to the extent these alleged events formed the basis for Plaintiff's October 2018 internal complaint, they necessarily are time-barred because the internal complaint came prior to December 25, 2018. However, this argument does not account for the re-occurrence of certain actions after the internal complaint was filed. For example, Plaintiff's EEOC complaint states, "similarly situated [CSSs] have, *and continue* to delegate their work or their undesirable assignments to me." (Doc. No. 64 Ex. CC (emphasis added).) Further, Plaintiff's testimony concerning performance evaluations does not limit her allegation to evaluations that occurred prior to her internal complaint. (Doc. No. 64 Ex. D at 145:15–146:16.)

2003) ("Under Rule 56(c), the moving party bears the initial burden of presenting evidence to show the absence of a genuine issue of material fact."). Accordingly, based on the evidence before it, the Court cannot conclude these alleged discriminatory acts are time-barred.

### 2.   *The non-time barred alleged discriminatory acts do not constitute "adverse employment actions."*

In the absence of direct evidence of employment discrimination, courts apply the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green* to employment discrimination claims under Title VII and the ADA. 411 U.S. 792, 802–04 (1973).

Under *McDonnell Douglas*, a plaintiff alleging discrimination must first establish a *prima facie* case for disparate treatment by a preponderance of the evidence. For a Title VII-based claim, a Plaintiff must establish (1) she belongs to a protected class; (2) she experienced an adverse employment action, and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002). Similarly, for an ADA-based claim, a Plaintiff must establish "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job with or without accommodation, and (3) she suffered an adverse employment action because of her disability." *Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 989–90 (10th Cir. 2021) (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003)). Under either theory, if Plaintiff can establish a *prima facie* case, the burden shifts to Defendant to offer a legitimate, nondiscriminatory reason for the alleged adverse employment actions. *Id.* at 990. If Defendant does so, the burden shifts back to Plaintiff to show

a genuine factual issue as to whether Defendant's proffered reason was pretextual. (*Id.*) An "adverse employment action" is a necessary predicate to Plaintiff's *prima facie* claims.[15]

The Tenth Circuit liberally defines the phrase "adverse employment action." *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir.1998). "Such actions are not simply limited to monetary losses in the form of wages or benefits." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998). However, "a mere inconvenience or an alteration of job responsibilities does not constitute an adverse employment action." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (quotation omitted); *see MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) ("While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018))). To constitute an adverse employment action, an employee must experience a "significant change in employment status, such as hiring, firing, fail[ure] to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (internal quotation omitted).

As discussed above, Plaintiff has alleged the following non-time barred, adverse employment actions: (1) the verbal reprimands for her work attire; and (2) the unfair

---

[15] Defendants do not dispute that Plaintiff, an African American woman, belongs to a Title VII protected class on the basis of race. (Doc. No. 64 at 24–29.) While Defendants do dispute Plaintiff's contention that she is disabled as defined under the ADA, the Court need not reach that issue because the Court finds the non-time barred discriminatory acts are not "adverse employment actions." (*Id.* at 30–31.)

performance evaluation(s); and (3) the unfair delegation of assignments causing a heavy workload. (Doc. Nos. 10; 64 Ex. CC.) For the following reasons, the Court finds there is no genuine dispute as to any material fact concerning these allegations and as a matter of law, these actions are not "adverse employment actions" for the purpose of Plaintiff's *prima facie* case.

The Court begins with the verbal reprimands of Plaintiff's work attire. It is well established that employer reprimands, in and of themselves, generally do not constitute adverse employment actions. *See Fortner v. State of Kan*., 934 F. Supp. 1252, 1267 (D. Kan. 1996), *aff'd sub nom. Fortner v. Rueger*, 122 F.3d 40 (10th Cir. 1997) (holding that verbal reprimands were "far too ephemeral in nature and effect as to be considered adverse employment actions"); *Lewis v. Denver Fire Dep't*, No. 09-CV-0004-RBJ-MJW, 2011 WL 6841530, at *5 (D. Colo. Dec. 29, 2011) ("A written reprimand generally is insufficient to constitute an adverse employment action." (collecting cases)); *see also Hartley v. Dep't of Agric.*, No. 10-CV-0323- ZLW-CBS, 2010 WL 5865371, at *4 (D. Colo. Nov. 29, 2010) ("[O]ral reprimands and unnecessary derogatory comments ... are not … within the definition of adverse action absent evidence that they had some impact on the employee's employment status."), *report and recommendation adopted*, No. 10-CV-00323-ZLW-CBS, 2011 WL 721861 (D. Colo. Feb. 23, 2011). Thus, standing alone, Ms. Wade's reprimands of Plaintiff's work attire do not constitute adverse employment actions as they did not cause a "significant change in employment status." *Piercy*, 480 F.3d at 1203; (*see* Doc. No. 64 Ex. D at 85:7–23). If there were evidence that these reprimands were accompanied by significant discipline, such as a suspension, demotion, or pay cut, the Court's analysis would naturally change. However, Plaintiff herself testified that she was never disciplined or even asked to change her clothes on the occasions when Ms. Wade commented on her clothing. (Doc. No. 64 Ex. D at 85:20–86:1.) Accordingly, the verbal

29

reprimands of Plaintiff's work attire were not adverse employment actions and cannot form the basis for a disparate treatment claim.

Next, the court considers the negative performance reviews. Standing alone, performance reviews also do not constitute an adverse employment action.[16] *See Rennard v. Woodworker's Supply, Inc.*, 101 F. App'x 296, 308 (10th Cir. 2004) (holding that negative performance evaluation was not an adverse employment action when "the record [was] devoid of any evidence showing that the performance evaluation had an adverse effect on plaintiff's job status"); *Smart*, 89 F.3d at 442 (holding the same); *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (holding the same); *see also Meredith v. Beech Aircraft Co.*, 18 F.3d 890, 896 (10th Cir. 1994) (holding that a satisfactory evaluation, without explanation why it might be considered negative evaluation, and without any evidence of adverse action relating to the evaluation, was not actionable adverse employment action). Plaintiff has not alleged, nor submitted evidence, suggesting that her performance reviews contributed to a change in her terms and conditions of employment or job status, such as a demotion or pay cut. Accordingly, Plaintiff's performance reviews are not an adverse employment action upon which a disparate treatment claim can be based.

---

[16] The Court notes that Plaintiff primarily focuses on the claim that performance evaluations were based on tenure instead of performance and were thus *unfair*, rather than an allegation that she received *negative* performance reviews. Indeed, in her affidavit, Ms. Wade stated that Plaintiff was a strong performer. Still, to the extent that Plaintiff's allegation implies a belief that she would have received a stronger performance review had the reviews been on merit rather than tenure, the Court finds case law on negative performance reviews an appropriate frame for this allegation. The Court also notes that Ms. Wade's affidavit specifically denies the allegation that Plaintiff's performance evaluations were conducted based on tenure rather than performance, and, other than in deposition testimony submitted by Defendant, Plaintiff has not put forward evidence to support the claim. *See Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). ("Mere allegations unsupported by further evidence ... are insufficient to survive a motion for summary judgment.").

Finally, the Court considers the alleged heavy workload. The Tenth Circuit has held "an increased workload *might* constitute an adverse employment action in some circumstances." *Jones v. Barnhart*, 349 F.3d 1260, 1269– 70 (10th Cir. 2003) (emphasis added). However, "generalized and unsubstantiated claims" of an increased workload are not sufficient to establish an adverse employment action at summary judgment. *Id.* The "key inquiry is whether the increased workload was accompanied by a significant change in duties, responsibilities, or working conditions." *Id.* (internal quotation marks omitted).

Here, Plaintiff's claims and deposition testimony regarding her workload and the delegation of assignments by other CSSs, are almost entirely "generalized and unsubstantiated." In reviewing the docket and record, the Court found the following:

- In her operative Complaint plaintiff alleges that "[t]he workload on the job and duties in the office are not distributed equally not even the phone call take[n] on a daily basis," and "[o]ther CSS[s] would call me on the phone … trying to get me to correct or do their work" (Doc, No. 10-1.)

- In her Response to the Motion, Plaintiff states "Lana Monge[r] … [delegated] a work task that she should have done," "[other CSSs] would do things on the job … that would place the heavy load on me," and "I was always doing the bulk of the work carrying the load for every CSS." (Doc. No. 74 at 2, 3, 7.)

- In her deposition, Plaintiff testified she was assigned "extra duties" during Ms. Wade's health-related leave,[17] that Ms. Monger would "tell [her] what to do," that a certain CSS would "try[ ] to make me do her job instead of doing it herself," "I was the only one

---

[17] These included maintaining the safe, petty cash, dealing with walk-in customers, getting the office mail, and performing minor administrative tasks around the office. Plaintiff testified that the extra duties took about five minutes.

actually doing the work," and "I was the one doing all the cases … plus answering the phone, plus working in the new system." (*Id.* Ex. D at 29:9–17, 43:16, 63:3–4, 117:15, 118:9–11.)

While Plaintiff's allegations make clear she felt her workload was unfairly heavy compared to the other CSSs (in part due to the delegation of assignments by other CSSs), her contentions are conclusory, general, and unsubstantiated. Plaintiff's claims lack specific details, such as the tasks other CSSs would delegate, or specific evidence as to how the nature, volume, or time it took to complete her work differed from other the CSSs' work. Without such details, the Court cannot conclude that Plaintiff's workload constituted an adverse employment action. *See Jones*, 349 F.3d at 1266–67 (unsubstantiated claims that the plaintiff's case files seemed thicker than her colleagues' files did not rise to the level of an adverse employment action). *Cf. Dial v. McDonough*, No. CV 21-01071-KHV-ADM, 2022 WL 17289152, at *10 (D. Kan. Nov. 29, 2022) (holding that a plaintiff demonstrated that her increased workload was an adverse employment action when she "established that (1) she worked three full-time positions … even though defendant hired her for one full-time position; (2) she worked extensive weekend hours (19 hours in one weekend) to manage job duties; (3) on January 13, 2020, [the plaintiff's supervisor] once again changed and added to plaintiff's job duties; (4) [the plaintiff's supervisor] did not expect other supervisors to also work three full-time positions; and (5) after plaintiff left the [job], defendant hired three people to replace her").

Accordingly, no reasonable jury could conclude, based on this record, that Plaintiff has carried her burden of demonstrating her workload constituted an adverse employment action upon which a disparate treatment claim can be based. *See Baca*, 398 F.3d 1216 ("Mere

allegations unsupported by further evidence ... are insufficient to survive a motion for summary judgment.").

### 3. Defendant is entitled to summary judgment on Plaintiff's pay discrimination claim.

Plaintiff also alleges that she received the "lowest salary" of any CSS, including, for a time, a CSS hired at Denver Service Unit during Plaintiff's employment. The Court construes this as an allegation of pay discrimination. (Doc. No. 10-1 at 1.)

Title VII prohibits "discriminat[ing] against any individual with respect to [her] compensation ... because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A Title VII pay discrimination claim is also analyzed under the burden-shifting framework established in *McDonnell Douglas*. 411 U.S. 792 (1973). In this context, a plaintiff bears the initial burden of establishing a *prima facie* case of race-based pay discrimination by showing "proof of unequal pay between the [plaintiff] and co-workers outside the protected class doing the same work." *Almond*, 665 F.3d at 1181. "[T]he key to a successful claim is a showing that the employer discriminatorily paid the [plaintiff] too little for the position he or she occupies." *Id.; see Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." (citation and internal quotation marks omitted)). If Plaintiff establishes a *prima facie* case, the Court then engages in the burden-shifting process described above. *See Edmonds-Radford*, 17 F.4th at 989–90 (citing *Davidson*, 337 F.3d at 1188).

In her operative Complaint, Plaintiff asserts that she was paid less than her white co-workers. (Doc. No. 10.) Plaintiff repeated this claim in her deposition, saying that she received

the "lowest salary" of any CSS. (*Id.* Ex. D at 142:17.) Plaintiff also testified that a new CSS, hired at Denver Service Unit during Plaintiff's employment, started with a higher wage than her.

However, Plaintiff has not submitted any evidence—such as payroll documents or personal pay stubs—to present "proof of unequal pay between the [plaintiff] and co-workers." *Almond*, 665 F.3d at 1181; *see Baca*, 398 F.3d at 1216 ("Mere allegations unsupported by further evidence ... are insufficient to survive a motion for summary judgment."). Moreover, even if Plaintiff had submitted evidence sufficient to establish such a disparity, Plaintiff's deposition testimony cuts against an inference that the unequal pay was racially motivated, as she testified that 1) the CSS hired during her employment had substantially more formal customer service experience,[18] and 2) at some point after the new CSS was hired, Plaintiff was given a raise, matching the new CSS's hourly wage. (Doc. No. 64 Ex. D at 142:25–144:23.) Plaintiff additionally testified she earned the highest commission and bonus of the CSSs. (*Id.* Ex. D at 94:13–95:9, 120:15.) Thus, Defendant is entitled to summary judgment on this claim.

### B. Hostile Work Environment

Plaintiff also alleges she was subject to a hostile work environment on the basis of race. (Doc. No. 10-1.) Defendant contends it is entitled to summary judgment on this claim because the allegations in Charge One describe events that occurred outside the 300-day statute of limitations for an EEOC charge. (Doc. No. 64 at 21–23.) In the alternative, Defendant argues Plaintiff has failed to present evidence sufficient to survive summary judgment on the claim. (*Id.* at 29.)

With regard to timeliness, a hostile work environment claim comes with different considerations than discrete act claims. "[T]he incidents constituting a hostile work environment

---

[18] Additionally, when asked whether anyone else with less seniority made more money than her, Plaintiff did not directly answer. (Doc. No. 64 Ex. D at 145:9–13.)

are part of one unlawful employment practice, [and accordingly] the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within … 300 days of any act that is part of the hostile work environment." *Morgan*, 536 U.S. at 118. In other words, an employee asserting a hostile work environment claim may maintain allegations over 300 days old at the time of her EEOC complaint *so long as* the most recent hostile action took place within the 300-day limitation period. *See Morgan*, 536 U.S. at 122 ("A charge alleging a hostile work environment claim … will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.").

For the reasons set forth above, there are certain acts that cannot be considered time-barred, because they took place over an extended period of time and/or because they took place on undefined dates and a jury could conclude that at least one allegedly hostile act occurred within the 300-day limitation period. *See supra* at 25–27; *see also Trainor*, 318 F.3d at 979 ("Under Rule 56(c), the moving party bears the initial burden of presenting evidence to show the absence of a genuine issue of material fact."). And, to the extent they are considered part of the allegedly hostile work environment, they are continuing violations, the last of which can save an otherwise untimely claim. *Morgan*, 536 U.S. at 118. Accordingly, the Court cannot find Plaintiff's hostile work environment claim time-barred.

The Court thus turns to the merits of Plaintiff's hostile work environment claim. To survive summary judgment on a claim alleging a racially hostile work environment, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of*

*Boulder*, 388 F.3d 1312, 1327 (10th Cir. 2004) (internal quotation marks and citation omitted). A plaintiff may succeed in proving a hostile work environment claim either on the *pervasiveness* of the race-based harassment or the *severity*. *See Chavez v. New Mexico*, 397 F.3d 826, 831–32 (10th Cir. 2005) (a plaintiff must put forward evidence of specific events or conduct which subjected her to race-based hostility such that a court can determine whether the events or conduct were pervasive or severe enough "to alter the terms, conditions, or privilege[s] of employment"). However, a plaintiff must present evidence tending to show the harassment stemmed "from the animus against a protected class to which the defendant thinks the plaintiff belongs,"—in this case, race-based animus. *Slover v. Univ. of Colorado*, No. 1:21-CV-01378-SKC, 2022 WL 833364, at *4 (D. Colo. Mar. 20, 2022) (citing *Bloomer v. United Parcel Serv., Inc.*, 94 F. App'x. 820, 825 (10th Cir. 2004)). "General harassment alone is not actionable." *Gorny v. Salazar*, 413 F. App'x 103, 112 (10th Cir. 2011).

Here, a substantial number of Plaintiff's allegations regarding a hostile work environment are broad and generalized, lacking details or descriptions of specific racially harassing events or comments. For example, Plaintiff testified that "all [of her fellow CSSs] treated [her] poorly," the CSSs were "very petty," Ms. Monger was "[mean,] territorial, envious, jealous [and] bossy," and Plaintiff "was the only one being treated like [this]." (Doc. No. 64 Ex. D at 43:13; 61:20–24, 98:19–25.) Further, certain allegations that do refer to specific events, such as Plaintiff's allegations regarding Ms. Wade's dress code comments, the delegation of assignments by other CSSs, and Mr. Haynes' alleged comment that Plaintiff should consider finding a new job, lack detail or evidence that they stemmed from race-based animus. (*Id.* Ex. D at 29:9–17; 43:16, 48:23–49:24, 63:3–4, 85:7–23, 117:15, 118:9–11.)

However, not all of Plaintiff's hostile work environment allegations are devoid of detail or potentially race-based animus. Indeed, Plaintiff testified in detail to an occasion on which it appeared Ms. Monger did not want to touch her, describing how Ms. Monger gave her an envelope without placing it in her hand shortly after placing the same envelope in the hand of a white co-worker. (*Id.* Ex. D at 95:22–96:7.) Additionally, Plaintiff testified to an incident in which she perceived Ms. Monger's husband acting to intimidate her in the office parking lot,[19] and how, though Ms. Wade said Mr. Monger was not allowed to be around the office anymore, this policy was not well enforced by Defendant. (*Id.* Ex. D at 76:10–79:4.) Plaintiff did not testify that overtly racist comments or actions accompanied either event, but she appears to believe her race played a role in both.[20] *See generally Taylor v. Kaiser Found. Health Plan of Colorado*, No. 21-CV-00012-NYW-NRN, 2022 WL 16855697, at *13 (D. Colo. Nov. 10, 2022) (declining to grant the defendant's summary judgment motion on a "hostile work environment claim [ ] not based on the use of any overt race-based statements or slurs" but instead predicated on evidence that the defendant "ignored, avoided, or failed to investigate complaints of race-neutral bullying or perceived racial discrimination").

Accordingly, the evidence supports at least two allegedly hostile acts reasonably connected to race-based animus. Further, there is evidence of other ongoing acts—including comments on Plaintiff's work attire and the repeated delegation of work assignments—which may have also contributed to a race-based hostile work environment. The prove her claim,

---

[19] Defendant submitted a contemporaneous email from Ms. Monger that denies any allegation her husband intended to intimidate Plaintiff. (Doc. No. 64 Ex. J.) However, at the summary judgment stage, the Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

[20] To this end, it is undisputed that Plaintiff raised concerns about a racially hostile environment to her superiors. (*See* Doc. No. 64 Ex. P at 1 (making "a formal complaint of racial tension and … a hostile [working] environment.").)

Plaintiff must show these acts were sufficiently "severe" or "pervasive" to establish a racially

hostile work environment. And, as noted by the Tenth Circuit, "the severity and pervasiveness

evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment

because it is inherently fact-found by nature." *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1222 (10th

Cir. 2015). Indeed, courts in this district have commonly found that "the issue of severity or

pervasiveness is more appropriate for a jury." *Taylor*, 2022 WL 16855697, at *18.

At summary judgment, it is not the role of the Court to make credibility determinations.

Instead, because the Court finds that under the totality of the circumstances of this case—which

"is the touchstone of a hostile work environment" claim—a reasonable jury *could* find in

Plaintiff's favor, the Court concludes that Plaintiff has raised a genuine issue as to whether she

experienced a racially hostile work environment. *Lounds*, 812 F.3d at 1222 (cleaned up)). And

further, the Court finds that a jury would be better suited to make the necessary findings of fact

regarding the issue of severity or pervasiveness. For these reasons, the Court declines to grant

summary judgment on this claim.

## III.    Plaintiff's FMLA Claim

Finally, Plaintiff alleges that Defendant violated the FMLA under 29 U.S.C. §

2615(a)(1) and (2) in connection with her use of leave to address her bipolar disorder. "This

circuit has recognized two theories of recovery under § 2615(a): an entitlement or interference

theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from §

2615(a)(2)." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).

Defendant contends that Plaintiff cannot survive summary judgment under either theory. (Doc.

No. 64 at 33–35.) The Court agrees.

First, "to prevail on an interference or entitlement theory, the plaintiff must demonstrate: (1) that [she] was entitled to FMLA leave, (2) that some adverse action by the employer interfered with [her] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Metzler*, 464 F.3d at 1180 (internal quotation marks omitted) (quoting *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005)). There is no evidence Defendant interfered with Plaintiff's right to take FMLA leave. Indeed, though Plaintiff vaguely testified that she at times felt uncomfortable using her leave, she also testified that Defendant *never* denied a request to use FMLA leave—requests that were often made multiple times per week. (*Id.* Ex. D. 130:12–133:24, 166:24–167:13, 174:8–11, 211:17–22.) There is also no evidence Plaintiff was subject to an adverse employment action on the basis of her FMLA leave. (*Id.*) Indeed, Plaintiff even admitted to no-call no-shows, under the banner of FMLA leave, without receiving anything more than a verbal reprimand. (*Id.*) Plaintiff has not established an FMLA violation under this theory.

Second, to establish a claim for FMLA retaliation, Plaintiff "must show that: (1) she engaged in a protected activity; (2) Defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Metzler*, 464 F.2d at 1171. As noted, there is no evidence Plaintiff was subject to materially adverse action due to her use of FMLA leave. Although it appears there was an occasional verbal reprimand for a no-call no-show, and Ms. Wade requested that Plaintiff schedule her appointments on certain days, there is no evidence that Plaintiff was retaliated against, or even that she received pushback for using FMLA leave. (*Id.* Ex. D at 171:9–11, 174:8–11, 209:1–2, 211:17–22.)

Accordingly, Defendant is entitled to summary judgment on Plaintiff's FMLA claims.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED IN PART** as follows:

1. Plaintiff's claims for retaliation, race discrimination, and disability discrimination arising in connection with her termination are **dismissed *without* prejudice**.

2. Plaintiffs' claims for disparate treatment are **dismissed *with* prejudice**.

3. Plaintiff's Family Medical Leave Act claim is **dismissed *with* prejudice**.

Defendant's Motion for Summary Judgment is **DENIED** as it concerns Plaintiff's hostile work environment claim. **If Plaintiff chooses to file a motion to amend the Complaint at this stage to reflect the Court's decisions as set forth in this Order, said motion must be filed on or before May 1, 2023.**

Dated this 30th day of March, 2023.

**BY THE COURT:**

_____
Maritza Dominguez Braswell
United States Magistrate Judge